UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

A.C.M., INC.
a West Virginia corporation,

       Plaintiff,

v.                                          Civil Action No. 2:08-0169

DAIMLER TRUCKS NORTH AMERICA, LLC,
a limited liability company,
f/k/a Freightliner, LLC,
d/b/a Western Star Trucks,
WESTERN STAR TRUCK SALES, INC.,
a corporation, and DETROIT DIESEL
CORPORATION, a corporation,

       Defendants/Third-Party Plaintiffs,

v.

HERITAGE EQUIPMENT, INC.,
a West Virginia corporation,

       Third-Party Defendant.


## MEMORANDUM OPINION AND ORDER


       Pending is the partial motion to dismiss of defendants Daimler Trucks North America, LLC ("Daimler") and Detroit Diesel Corporation ("Detroit Diesel"), filed June 23, 2008, wherein the movants seek the dismissal of Count IV of the complaint.  For the reasons that follow, the motion is granted.

1

I.

As the pending motion is to dismiss for failure to state a claim upon which relief can be granted, the following facts, taken from the complaint, are accepted as true. Plaintiff, A.C.M., Inc. ("A.C.M.") filed the above titled action against Daimler, Detroit Diesel and Western Star Truck Sales, Inc. ("Western Sales") on March 14, 2008.  Prior to January of 2008, Daimler was named Freightliner, LLC.  (Compl. ¶ 3). According to the complaint, Western Sales is a wholly owned subsidiary of Daimler, and Daimler and Detroit Diesel are affiliated companies under the common ownership or control of Daimler AG, formerly ChryslerDaimler AG, or its subsidiaries. (Id. ¶ 4-8).

A.C.M. owns and leases numerous heavy duty trucks for the transport of coal in Southern West Virginia.  (Compl. ¶ 11). A majority of the corporation's truck fleet is utilized exclusively for off-road hauling from mining sites to stockpiles for coal preparation plants or loading points.  (Id. ¶ 12).  As of 2001, a portion of A.C.M.'s truck fleet has consisted of Western Star off-road, severe duty trucks, manufactured by Daimler.  (Id. ¶ 12).  Between November of 2004 and April of

2

2006, A.C.M. purchased fifteen 2005 and 2006 Western Star Model 6900XD trucks (the "WS trucks") from Daimler's West Virginia dealer, Heritage Equipment, Inc. ("Heritage") in Beckley, West Virginia.[1]  (Id. ¶ 13-14).  These fifteen trucks were manufactured and distributed by Daimler and Western Sales. (Compl. ¶ 14).  Each custom-built truck was purchased by A.C.M. from Heritage after an order was placed with Daimler for its manufacture with a dump body and an off-road planetary configuration for the hauling of coal.  (Id. ¶ 15).  The total sale price for the fifteen trucks was $4,039,167.  (Id.)

         The WS trucks purchased by A.C.M. are so large that they cannot be licensed for highway use in West Virginia or any other state.  (Id. ¶  16).  Promotional materials presented to purchasers of Western Star 6900XD trucks by Western Sales, a corporation involved in the sale and marketing of vehicles manufactured by Daimler, (Id. ¶ 7), states that,

> [f]or extreme applications when the ordinary rules of tonnage and terrain cease to apply, Western Star offers custom-built high-performance trucks . . . the 6900 XD, which was built to handle the toughest severe-duty applications, is perfect for the most challenging military, oilfield and mining jobs.

---

[1] A.C.M. did not name Heritage as a defendant.  Daimler, Detroit Diesel and Western Sales, however, filed a third-party complaint against Heritage on June 11, 2008.

(Id.)  The Western Star trucks purchased by A.C.M. prior to the fifteen WS trucks in question were equipped with engines manufactured by Caterpillar, Inc.  (Id. ¶ 18).  Prior to purchasing the fifteen WS trucks, A.C.M. was advised by Heritage that pursuant to the operating parameters in place between Daimler and Heritage, the truck orders would be placed "at the factory" where Daimler would custom configure the engine and other components to meet A.C.M.'s usage and other requirements. (Id. ¶ 17).  A.C.M. was also told by Heritage that Daimler's engineers had determined that "an engine manufactured by Detroit Diesel could be installed in the WS trucks."  (Id. ¶ 18). Subsequently, Detroit Diesel engines were installed in the fifteen WS trucks.  (Id. ¶ 25).

As the WS trucks were delivered, A.C.M. was issued various warranties.  (Id. ¶ 19).  Amongst these warranties were express warranties for each truck, issued by Daimler, and for each engine, issued by Detroit Diesel.  (Id.)  The express warranties provide that each of the new WS trucks will be free of defects in material and workmanship which appear in normal use during specified time and mileage limitations.  (Id. ¶ 20).  The complaint states, however, that after the fifteen WS trucks were placed into service for off-road severe-duty coal hauling, the

4

Detroit Diesel engines repeatedly malfunctioned, necessitating premature overhauls and other repairs.  (<u>Id.</u> ¶ 21).  According to the complaint, these overhauls and repairs are covered by the warranties issued by Daimler and Detroit Diesel.  (<u>Id.</u>)

Following the engine malfunctions, A.C.M. presented the WS trucks to Heritage for repair pursuant to the warranties.  (<u>Id.</u> ¶ 22).  Heritage, however, advised A.C.M. that it was Daimler's contention that the problems encountered by A.C.M. were either, in whole or in part, the result of misuse by A.C.M., or the conditions under which the trucks had been operated.  (<u>Id.</u>)  Daimler's contention, according to the complaint, was incorrect.  (<u>Id.</u> ¶ 23).  Disputes between A.C.M. and the defendants regarding who bore the responsibility to repair the engines ensued.  (<u>Id.</u> ¶ 24).  During the course of these disputes, the defendants authorized Heritage's repair, and reimbursement for repair and replacement work under the warranties in amounts less than the total repair cost.  (<u>Id.</u> ¶ 24).  As a result, according to the complaint, A.C.M. was forced to incur repair costs which should have been borne by the defendants.  (<u>Id.</u>)

The Detroit Diesel engines continued to malfunction in all fifteen WS trucks and A.C.M. demanded a meeting with representatives of the defendants to address the problem.  (<u>Id.</u> ¶

25).  Pursuant to A.C.M.'s demand, a meeting was held with Bruce
Black, Detroit Diesel's representative, Anthony Mayes, A.C.M.'s
president, and Carl Hubbard, Heritage's vice president, in
attendance.  (Id.)  According to the complaint, at this meeting
Mr. Black admitted that the engine breakdowns were due to the
misapplication of the Detroit Diesel highway engines in trucks
utilized for severe off-road use.  (Id.)  A.C.M. learned through
the meeting, and subsequent investigation, that the Detroit
Diesel engines included by Daimler in the WS trucks were not
designed for the slow speeds and dusty conditions inherent in the
severe duty off-highway hauling that defendants represented the
Western Star Model 6900XD was fit to accommodate.  (Id. ¶ 26).

        A.C.M. maintains that despite their realization that
they had falsely advised A.C.M. regarding the suitability of the
Detroit Diesel engines, and that the engines had been mistakenly
configured, the defendants continued to fail to perform their
warranty obligations and their obligation to cover all costs and
expenses resulting from the malfunctioning engines.  (Id. ¶ 27).
A.C.M. further maintains that the repairs and overhauls
authorized by the defendants, and performed by Heritage, were
inadequate, and as a result, the engines in the WS trucks which
were repaired or overhauled continued to malfunction.  (Id. ¶

28).  Thus, when it was clear that the engine repairs authorized by the defendants would not suffice, A.C.M. requested that the defendants agree to replace the Detroit Diesel engines with engines suitable for off-road use.  (Id. ¶ 29).  That request was denied. (Id.)

Following attempts to resort to the provisions of the warranties, (Compl. ¶ 30), A.C.M. commenced this suit.  The complaint sets forth the following claims: (Count I) Breach of Warranty against Daimler and Detroit Diesel; (Count II) Negligent Misrepresentation against all defendants; (Count III) Fraudulent Inducement against all defendants; (Count IV) Violation of W. Va. Code § 17A-6A-13 (for failure to perform warranty obligations) against Daimler and Detroit Diesel.  The pending motion to dismiss is directed only at Count IV.

A.C.M. is a West Virginia corporation with its principal office located in Summersville, West Virginia.  (Id. ¶ 1).  Daimler, Western Sales and Detroit Diesel are all incorporated under the laws of Delaware.  (Id. ¶ 2-6).  As the parties are diverse, and the amount in controversy exceeds $75,000, the court has jurisdiction pursuant to 28 U.S.C. § 1332.  The parties do not contest jurisdiction.

7

II.

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 127 S. Ct. at 1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions . . . ."  Twombly, 127 S. Ct. at 1965.  It is now settled that "a formulaic recitation of the elements of a cause of action will not do."  Id.

The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an element" of the claim.  Chao v. Rivendell Woods, Inc., 415 F.3d 342, 349 (4th Cir. 2005) (quoting Iodice v. United States, 289

8

F.3d 270, 281 (4th Cir. 2002)).  Instead, the opening pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level."  <u>Twombly</u>, 127 S. Ct. at 1965.  Stated another way, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  <u>Id.</u> at 1974.

Application of the Rule 12(b)(6) standard also requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'"  <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (quoting <u>Twombly</u>, 127 S. Ct. at 1965); <u>see also</u> <u>South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)).  The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ."  <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

### III.

Daimler and Detroit Diesel (hereinafter "defendants") move to dismiss Count IV of the complaint for failure to state a claim upon which relief can be granted.  (Mot. to Dismiss at 1-

3); see Fed. R. Civ. P. 12(b)(6).  That Count alleges that by
refusing to honor their warranty obligations, and providing only
partial reimbursement for repairs covered by the warranties, the
defendants violated W. Va. Code § 17A-6A-13(3)(a).  (Compl.  ¶
45).

     The heading for Article 6A of Chapter 17A of the West
Virginia Code is "Motor Vehicle Dealers, Distributors,
Wholesalers and Manufacturers."  The portion of § 17A-6A-13
relied upon in Count IV provides:

     (3) A manufacturer or distributor may not do any of the
     following:

          (a) Fail to perform any warranty obligation.

§ 17A-6A-13(3)(a).  A.C.M.'s claim in Count IV is founded in W.
Va. Code § 55-7-9,[2] which provides,

     Any person injured by the violation of any statute may
     recover from the offender such damages as he may
     sustain by reason of the violation, although a penalty
     or forfeiture for such violation be thereby imposed,
     unless the same be expressly mentioned in lieu of such
     damages.

(Compl. ¶ 47).[3]  Thus, A.C.M. contends that because it has

---

     [2] The complaint cites to W. Va. Code § 55-7-11.  A.C.M.'s
response to defendants' motion for summary judgment notes that
citation to § 55-7-11 was a typographical error.  (Resp. to Mot.
to Dismiss at 4 n.1).

     [3] As discussed more fully below, § 17A-6A-16 expressly
provides a cause of action for damages based upon violations of

suffered damages as a proximate result of the defendants'
violation of § 17A-6A-13(3)(a), it is entitled to damages
pursuant to § 55-7-9.  (Id. ¶ 47).

The defendants, however, contend that Count IV fails to
state a claim because (i) plaintiff lacks standing to bring a
claim under § 17A-6A-13 and (ii) § 17A-6A-13 does not apply to
the WS trucks at issue.  Thus, the court must determine whether §
17A-6A-13, in conjunction with  § 55-7-9, affords plaintiff a
private right of action.  If not, Count IV fails to state a
viable claim.  If so, inquiry must be made into whether § 17A-6A-
13 applies to the fifteen Western Star Model 6900XD trucks in
question.

Section 55-7-9 does not give rise to a private cause of
action for every violation of a statute.  Instead, § 55-7-9 "has
been interpreted as providing a general statement of liability
for violating a statute."  Schaffer v. Acme Limestone Co., Inc.,
524 S.E.2d 688, 702 n.17 (W. Va. 1999).  The parties agree that
the relevant test for determining whether plaintiff is possessed
of a private cause of action against the defendants for their
alleged violation of § 17A-6A-13(3)(a) is found in Hurley v.

_____

Article 6A.  See § 17A-6A-16(1).

<u>Allied Chemical Corp</u>, 262 S.E.2d 757 (W. Va. 1980).  (Memo. in

Supp. Mot. to Dismiss at 3; Resp. to Mot. to Dismiss at 4).  In

<u>Hurley</u> the Supreme Court of Appeals of West Virginia,

> **set forth the following as the appropriate test to
> determine when a State statute gives rise by
> implication to a private cause of action: (1) the
> plaintiff must be a member of the class for whose
> benefit the statute was enacted; (2) consideration must
> be given to legislative intent, express or implied, to
> determine whether a private cause of action was
> intended; (3) an analysis must be made of whether a
> private cause of action is consistent with the
> underlying purposes of the legislative scheme; and (4)
> such private cause of action must not intrude into an
> area delegated exclusively to the federal government.**

262 S.E.2d at 763.  <u>See</u> <u>also</u> <u>Arbaugh v. Bd. of Educ.</u>, 592 S.E.2d

235, 239 (W. Va. 2003) (stating "[t]he following is the

appropriate test to determine when a State statute gives rise by

implication to a private cause of action," and setting forth

<u>Hurley</u> factors); <u>Schaffer</u>, 524 S.E.2d at 703 (same); <u>Jenkins v.</u>

<u>J.C. Penny Cas. Ins. Co.</u>, 280 S.E.2d 252, 254 (W. Va. 1981)

(same).  Thus, the court must determine whether the plaintiff has

standing to assert a claim against the defendants for their

alleged violation of § 17A-6A-13(3)(a) pursuant to the factors

laid down in <u>Hurley</u>.  Inasmuch as this presents an unsettled

question of West Virginia law, it is necessary to "predict how

the state's highest court would rule on . . . [the] unsettled

issue." <u>Horace Mann Ins. Co. v. General Star Nat'l Ins. Co.</u>, 514

12

F.3d 327, 329 (4th Cir. 2008).  See also Salve ReginaCollege v.
Russell, 499 U.S. 225, 227 (1991) ("In decisions after Erie [R.R.
Co. v. Tompkins, 304 U.S. 64 (1938)], this Court made clear that
state law is to be determined in the same manner as a federal
court resolves an evolving issue of federal law: with the aid of
such light as is afforded by the materials for decision at hand,
in accordance with the applicable principles for determining
state law.") (internal quotation marks omitted).

Addressing the first prong of the Hurley test, namely,
whether plaintiff is a member of the class for whose benefit the
statute was enacted, both parties look to § 17A-6A-1, the
legislative finding relevant to Article 6A.  That provision
provides,

> [t]he legislature finds and declares that the
> distribution and sale of motor vehicles in this State
> vitally affects the general economy and the public
> welfare and that in order to promote the public welfare
> and in the exercise of its police power, it is
> necessary to regulate motor vehicle dealers,
> manufacturers, distributors and representatives of
> vehicle manufacturers and distributors doing business
> in this State in order to avoid undue control of the
> independent new motor vehicle dealer by the vehicle
> manufacturer or distributor and to ensure that dealers
> fulfill their obligations under their franchises and
> provide adequate and sufficient service to consumers
> generally.

§ 17A-6A-1.  Though the term "consumer" is nowhere defined in
Chapter 17A or Article 6A, both parties agree that as a purchaser

13

of the fifteen WS trucks, plaintiff is properly characterized as
such.  (Memo. in Supp. Mot to Dismiss at 4; Resp. to Mot. to
Dismiss at 8).  The defendants contend that while § 17A-6A-1 does
reference consumers as an "end-goal," (Reply to Resp. to Mot. to
Dismiss at 3), "the clear focus of . . . Article [6A] is the
regulation of manufacturers and distributors vis-à-vis
dealerships in order to prevent manufacturers/distributors from
asserting undue control over the dealership."  (Memo. in Supp.
Mot. to Dismiss at 4).  Plaintiff, on the other hand, argues that
§ 17A-6A-1's reference to "consumers" shows an intent "to ensure
that dealers provide good service to consumers."  (Resp. to Mot.
to Dismiss at 7).  Plaintiff further contends that given that §
17A-6A-13(3)(a) states that "[a] manufacturer or dealer may not .
. . fail to perform any warranty obligation," and the fact that
the legislature must have known that "the dealer's warranty
obligations run to the consumer," consumers must be a class of
persons for whose benefit the statute was enacted.  (Resp. to
Mot. to Dismiss at 8).

         In the context of interpreting Article 6A's indemnity
provision, § 17A-6A-15, the Supreme Court of Appeals of West
Virginia observed that Article 6A is "a comprehensive statute
intended to regulate the relationship and conduct of business

**14**

between motor vehicle dealers on the one hand, and automobile manufacturers and distributors on the other." City Nat'l Bank of Charleston v. Wells, 284 S.E.2d 374, 386 (W. Va. 1989).  Aside from the one instance in the quoted legislative findings in § 17A-6A-1, the term consumer is found four other times in Article 6A.  Only one of the four is pertinent.  See § 17A-6A-10(2)(d) and 12(5)(d).[4]  The term, however, is not found in the section of Article 6A upon which plaintiff relies.  See § 17A-6A-13.  As noted by the defendants, in Jenkins, a case implying a private cause of action in favor of third-party claimants against insurance companies under W. Va. Code § 33-11-4(9), and heavily relied upon by the plaintiff, the court found "[o]f particular significance" the fact that the statute giving rise to the cause of action made "particular reference to both 'insureds' and

---

[4] Section 17A-6A-10(2)(d) refers to the word consumer three times.  The sole instance of significance is the provision that "[i]n the event of manufacturer or distributor price reductions or cash rebates, the amount of any reduction or rebate received by a dealer shall be passed on to the private retail consumer by the dealer."  While this section may provide consumers with a cause of action against dealers, it says little, if anything, as to whether consumers possess a cause of action against distributors and manufacturers under § 17A-6A-13(3)(a) for breach of warranty obligations.

Section 17A-6A-12(5)(d) references convenient consumer care, but only as a factor for a court to consider in determining whether good cause exists for the establishment or relocation of a motor vehicle dealership in the context of a declaratory judgment action brought by a new motor vehicle dealer.

'claimants.'"  <u>Jenkins</u>, 280 S.E.2d at 255-56; (Reply to Resp. to
Mot. to Dismiss at 3).  In addition to not referencing consumers,
§ 17A-6A-13 does not afford as broad a remedy for a
manufacturer's or distributor's failure to perform warranty
obligations as the plaintiff would suggest.  While prohibiting
failure "to perform any warranty obligation" by manufacturers or
distributors, § 17A-6A-13(3)(a), such warranty obligations in
subsection (3)(a) are limited by the immediately preceding
subsections (1) and (2) of § 17A-6A-13.  Those subsections
provide,

> **(1) Each new motor vehicle manufacturer or distributor
> shall specify in writing to each of its new motor
> vehicle dealers licensed in this state the dealer's
> obligations for preparation, delivery and warranty
> service on its products. The manufacturer or
> distributor shall compensate the new motor vehicle
> dealer for warranty service required of the dealer by
> the manufacturer or distributor. The manufacturer or
> distributor shall provide the new motor vehicle dealer
> with the schedule of compensation to be paid to the
> dealer for parts, work and service, and the time
> allowance for the performance of the work and service.**

> **(2) . . . In the determination of what constitutes
> reasonable compensation under this section, the
> principal factor to be given consideration shall be the
> prevailing wage rates being paid by dealers in the
> community in which the dealer is doing business . . . .**

§ 17A-6A-13(1) and (2).  In turn, § 17A-1-1(aa), which provides
definitions for the terms used in Chapter 17 except as otherwise
provided, incorporates the definition of "new motor vehicle

dealer" found in § 17A-6-1.  That section provides as follows,

> "New motor vehicle dealer" means every person (other
> than agents and employees, if any, while acting within
> the scope of their authority or employment), engaged
> in, or held out to the public to be engaged in, the
> business in this state of selling five or more new
> motor vehicles or new and used motor vehicles in any
> fiscal year of a type required to be registered under
> the provisions of this chapter, except, for the
> purposes of this article only, motorcycles.

§ 17A-6-1(a)(1).  Thus assuming, arguendo, the fifteen WS trucks

in question constitute "new motor vehicles," Heritage would fall

within the definition of "new motor vehicle dealer."  Section

17A-6A-3 provides the following definitions of "distributor" and

"manufacturer" for purposes of Article 6A,

> "Distributor" means any person, resident or
> nonresident, who, in whole or in part, offers for sale,
> sells or distributes any new motor vehicle to a new
> motor vehicle dealer or who maintains a factory
> representative, resident or nonresident, or who
> controls any person, resident or nonresident, who, in
> whole or in part, offers for sale, sells or distributes
> any new motor vehicle to a new motor vehicle dealer.
>
> . . . .
>
> "Manufacturer" means any person who manufactures or
> assembles new motor vehicles; or any distributor,
> factory branch or factory representative.

§ 17A-6A-3(3) and (8).  Assuming Daimler and Detroit Diesel fall

within the definition of "distributor" or "manufacturer," § 17A-

6a-13(3)(a) appears to run to the benefit of Heritage, as a "new

motor vehicle dealer," and not to the plaintiff as a consumer.[5]
Clearly, at some level of abstraction Article 6A is intended to
benefit consumers of new motor vehicles.  At some level, however,
all statutes are presumably enacted to benefit the whole of
society.  In any event, whether plaintiff is a member of a class
for whose benefit Article 6A was enacted need not be resolved
inasmuch as plaintiff's claimed entitlement to a private cause of
action fails pursuant to prongs two and three of the Hurley test.

          Prong two of the Hurley test directs courts to consider
the legislative intent, express or implied, to determine whether
a private cause of action was intended.  The Supreme Court of
Appeals of West Virginia has noted "that when the meaning of a
statute is clear, it is the duty of the courts to respect
legislative intent by applying the statute as written."  Arbaugh,
591 S.E.2d at 240 n.5 (citing State v. General Daniel Morgan Post
No. 548, Veterans of Foreign Wars of the United States,, 137
S.E.2d 353 (W. Va. 1959).  As noted, Article 6A is "intended to
regulate the relationship and conduct of business between motor
vehicle dealers on the one hand, and automobile manufacturers and
distributors on the other."  Wells, 384 S.E.2d at 386.  While

---

          [5] The defendants argue that Detroit Diesel is neither a
manufacturer nor a dealer under § 17A-6A-3.  (Memo in Supp. Mot.
to Dismiss at 6).

18

"state statutes often have sparse legislative history or none at
all," <u>Hurley</u>, 262 S.E.2d at 762, the preface to Senate Bill No.
384, which in the year 2000 amended Article 6A to its current
form, notes that the legislature's intent in enacting the
amendment was to, among other things, clarify "the relationship
between automobile dealers, distributors and manufacturers . . .
[and to provide] for actions for damages and venue." S.B. 384,
2000 W. Va. Acts 1545. Under the heading "Actions at law;
damages," § 17A-6A-16 provides,

> (1) If a manufacturer or distributor terminates,
> cancels, fails to renew or discontinues a dealer
> agreement for other than good cause as defined in this
> article, or commits any other violation of this
> article, the <u>new motor vehicle dealer adversely
> affected</u> by the actions may bring an action for damages
> and equitable relief against the manufacturer or
> distributor. If the <u>new motor vehicle dealer</u> prevails,
> the dealer may recover, in addition to actual damages,
> treble damages up to three times the amount of the
> actual damages awarded, plus reasonable attorney's
> fees, regardless of the amount in controversy. For the
> purposes of the award of attorney's fees and costs,
> whenever the new motor vehicle dealer is seeking
> injunctive or other relief, the dealer may be
> considered to have prevailed when a judgment or other
> final order providing equitable relief is entered in
> its favor.
>
> (2) A manufacturer or distributor who violates this
> article is liable for all damages sustained by <u>a new
> motor vehicle dealer</u> as a result of the violation.
>
> (3) A manufacturer or distributor or new motor vehicle
> dealer may bring an action for declaratory judgment for
> determination of any controversy arising pursuant to
> this article.

19

(4) Any corporation or association which is primarily
owned by or composed of <u>dealers</u> and which primarily
represents the interests of dealers has standing to
file a petition or cause of action with the court of
competent jurisdiction for itself or by, for or on
behalf of any, or a group of, new motor vehicle dealers
for any violation of this article or for the
determination of any rights created by this article.

(5) In addition to any county in which venue is proper
in accordance with the constitution and laws of this
state, in any cause of action brought by a <u>new motor
vehicle dealer</u> against a manufacturer or distributor
for any violation of this article or for the
determination of any rights created by the dealer's
franchise agreement, venue is proper in the county in
which the dealer is engaged in the business of selling
the products or services of the manufacturer or
distributor.

(emphasis added).  The Supreme Court of Appeals of West Virginia

has recognized that "in the interpretation of statutory

provisions the familiar maxim <u>expressio unius est exclusio</u>

<u>alterius</u>, the express mention of one thing implies the exclusion

of another, applies."  <u>Phillips v. Larry's Drive-In Pharmacy,</u>

<u>Inc.</u>, 647 S.E.2d 920, 928 (W. Va. 2007) (quoting <u>Manchin v.</u>

<u>Dunfee</u>, 327 S.E.2d 710, 713 (W. Va. 1984).  This long-standing

maxim of statutory interpretation,

is premised upon an assumption that certain omissions
from a statute by the Legislature are intentional.  As
the court explained in <u>Riffle</u>, "if the Legislature
explicitly limits application of a doctrine or rule to
one specific factual situation and omits to apply the
doctrine to any other situation courts should infer the
Legislature intended the limited rule would not apply
to any other situation." [<u>State ex rel. Riffle v.</u>
<u>Ranson</u>, 464 S.E.2d 762, 770 (W. Va. 1995)].

20

<u>Id.</u>  The court must assume, therefore, that by explicitly providing a cause of action for damages in favor of new motor vehicle dealers for "violations of this article," § 17A-6A-16(1), the legislature intentionally neglected to provide such a cause of action in favor of others, including consumers.  Thus, as the statute is clear, and only new motor vehicle dealers are afforded a cause of action for damages, to imply a private cause of action in favor of the plaintiff would be to disregard the legislature's express intent and impermissibly infringe on that body's province.[6]

Under prong three of the <u>Hurley</u> test the court must consider whether a private cause of action is consistent with the underlying purpose of the legislative scheme.  Plaintiff summarily concludes that "permitting a private cause of action from consumers where manufacturers have breached warranty obligations will likewise serve as a deterrent against violations of the statute."  (Resp. to Mot. to Dismiss at 8).  Of course, this is true.  Yet, as noted by the defendants, according to

_____

   [6] As noted <u>supra</u> in footnote 4, § 17A-6A-10(2)(d) may provide a private cause of action in favor of a retail consumer to recover price reductions or cash rebates received by a dealer, despite the language of § 17A-6A-16.  Whether such an implied cause of action exists, however, is not in question here and the court offers no opinion on the issue.

plaintiff's reasoning a private cause of action should be implied for all statutory violations because in enacting legislation the legislature necessarily desires compliance therewith.  (Reply to Resp. to Mot. to Dismiss at 4).  A note to a draft of S.B. 384 states that "[t]he purpose of this bill is to clarify the relationship between automobile dealers, distributors and manufacturers."  S.B. 384, 2000 Reg. Sess. <u>available at</u> http://www.legis.state.wv.us/Bill_Text_HTML/2000_SESSIONS/RS/Bills/sb384%20intr.htm.  Consistent with this purpose, the legislature saw fit to provide only new automobile dealers a cause of action for damages.

Article 6A regulates the relationships between "motor vehicle dealers, manufacturers, distributors and representatives of vehicle manufacturers and distributors doing business in this State."  § 17A-6A-1.  These relationships are regulated in order to avoid "undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to ensure that dealers fulfil their obligations under their franchises and provide adequate and sufficient service to consumers generally."  <u>Id.</u>  To afford the plaintiff a private cause of action would be to expand the relationships regulated by Article 6A in derogation of the purpose of the legislative scheme.  This reading of

Article 6A may be analogized to "the maxim that, '[t]ypically, when two statutes govern a particular scenario, one being specific and one being general, the specific provision prevails.'" <u>Harrison County Comm'n v. Harrison County Assessor</u>, 658 S.E.2d 555, (W. Va. 2008) (quoting <u>Bowers v. Wurtzburg</u>, 519 S.E.2d 148, 160 (W. Va. 1999)).  The more specific substantive provisions of Article 6A, including § 17A-6A-13(3)(a), constitute the means to the legislature's ends of "promot[ing] the public welfare" by adopting a regulatory scheme "in order to avoid undue control of the independent new motor vehicle dealer" and "to ensure . . . sufficient service to consumers generally."  The means - regulation of dealers, manufacturers and distributors - constitute the more specific and relevant purpose of Article 6A. While consumers ultimately benefit from the requirements set forth in Article 6A, the more immediate purpose of the Article is the regulation of interactions between dealers, manufacturers and distributors.[7]  The relationship between consumers and the groups

---

[7] Even a cursory review of Article 6A shows that its purpose is, as noted in <u>Wells</u>, "to regulate the relationship and conduct of business between motor vehicle dealers on the one hand, and automobile manufacturers and distributors on the other."  384 S.E.2d at 386.  All of Article 6A's substantive provisions regulate dealers, manufacturers and distributors.  <u>See</u> § 17A-6A-4 through 15.  For example, § 17A-6A-4 regulates cancellation of dealership agreements by manufacturers or distributors, § 17A-6A-7 regulates the notice to be afforded a dealer in the event a dealer agreement is canceled, § 17A-6A-8 regulates the

23

regulated by Article 6A, as shown below, was left to be regulated by other law.

In inferring a private cause of action under W. Va. Code § 27-5-9(a), the Hurley court assumed "that the Legislature would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights."  262 S.E.2d at 764.  Here, the legislature granted rights to an identifiable class, namely, new motor vehicle dealers, and enabled the class members to enforce those rights though § 17A-6A-16.  Further, as pointed out by the defendants, Hurley notes that "the absence of any other method of enforcing the declared right makes it clear that the finding of an implied cause of action would not frustrate the legislative intent."  Id.; (Reply to Resp. to Mot. to Dismiss at 4-5).  In this case, not only does Section 16 of Article 6A provide an express cause of action only in favor of new automobile dealers,[8]

---

compensation to be afforded a dealer in the event of cancellation of a dealer agreement, § 17A-6A-8a regulates compensation to be paid by manufacturers and distributors to dealers for services rendered, and § 17A-6A-10 sets forth prohibited practices in regards to manufacturers' and distributors' interactions with dealers.

[8] Manufacturers, distributors and dealers may also bring an action for declaratory or injunctive relief.  See § 17A-6A-16(3) and 17.

but the law does not leave the plaintiff, and other consumers, without an avenue of redress.  That avenue is one of which the plaintiff took advantage by asserting its claim for breach of warranty against the defendants in Count I of the complaint. (Compl. ¶ 33-36).[9]

The court concludes that inferring a private cause of action under § 17A-6A-13(3)(a) in favor of the plaintiff in the circumstances of this case would not be consistent with the underlying purposes of the legislative scheme.  The court is of the view that the Supreme Court of Appeals of the State of West Virginia, if confronted with the issue, would reach a similar conclusion.

Thus, plaintiff lacks standing to assert its claim in Count IV of the complaint.  It is unnecessary, then, to consider whether § 17A-6A-13 applies to the fifteen WS trucks in issue. The defendants' partial motion to dismiss is granted.

IV.

---

[9] As to the fourth prong of the Hurley test, both parties agree that inferring a private cause of action would not intrude into an area exclusively delegated to the federal government. (Memo. in Supp. Mot to Dismiss at 5 n.2; Resp. to Mot. to Dismiss at 9).

It is, accordingly, ORDERED that Count IV be, and it hereby is, dismissed as to defendants Daimler Trucks North America, LLC, and Detroit Diesel Corporation.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED: March 31, 2009

John T. Copenhaver, Jr.
United States District Judge